FILED
United States Court of Appeals
Tenth Circuit

May 26, 2016

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

OSCAR BETANCES,

    Defendant - Appellant.

No. 15-2106
(D.C. No. 2:14-CR-03432-RB-2)
(D. N.M.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **TYMKOVICH**, Chief Judge, **HARTZ** and **MORITZ**, Circuit Judges.
_____

Oscar Betances appeals the district court's denial of his motion to suppress

incriminating statements and evidence that law enforcement obtained during a traffic

stop. Because a reasonable suspicion justified the stop, we affirm.

**BACKGROUND**

Betances entered the United States at the Antelope Wells border crossing in

the Bootheel region of New Mexico. There, border patrol agents searched his blue

convertible Chrysler Sebring—a vehicle uncommon in the Bootheel region—checked

its registration, and ran Betances' criminal history. The agents ultimately allowed

_____

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however, for
its persuasive value. *See* Fed. R. App. P. 32.1; 10th Cir. R. 32.1.

Betances to enter the United States. But they notified other agents in the area that they were suspicious of Betances given his travel route and his criminal history of drug possession.

Betances traveled north from Antelope Wells on Highway 81, a well-known drug trafficking route. Anticipating Betances' likely movements, Border Patrol Agent Julian Rodriguez positioned his vehicle at the intersection of Interstate 10 and Highway 146. However, when agents tailing Betances radioed Rodriguez and informed him that Betances had turned west on Highway 9 before heading north again on Highway 113, Rodriguez repositioned himself at the intersection of I-10 and Highway 113. Rodriguez waited at the intersection for Betances, parking his vehicle on the side of the road, about ten feet away from where Betances' vehicle would pass.

As Betances approached the intersection, he slowed his vehicle to 10-20 miles per hour and passed Rodriguez while staring straight ahead and keeping both hands on the steering wheel. Rodriguez thought this behavior was odd, testifying that drivers in the Bootheel region typically turn their heads to look at him when they pass.

But Betances' behavior wasn't the only thing that struck Rodriguez as suspicious. As Betances passed, Rodriguez also observed "a large, dark and square-looking object" with "something colorful on top" in Betances' backseat. R. vol. 3, 15-16. Rodriguez immediately believed the object was a marijuana bundle with

colorful straps—one of "easily over a thousand" such bundles Rodriguez has seen during his six years as a border patrol agent. *Id.* at 16. Rodriguez explained that one to two times a week his border patrol station apprehends smugglers who bring marijuana into the United States by backpacking bundles of marijuana across the border and leaving them near highways in south New Mexico—including Highway 81—so that someone in a vehicle can later retrieve them and transport them north. Rodriguez found it significant that the bundle in Betances' vehicle had "something colorful on top" because bright colors are "consistent with the straps that [drug smugglers] use on the burlap bundles." *Id.*

Rodriguez grew even more suspicious when Betances turned east on I-10 just minutes after turning to travel west on Highway 9. Rodriguez explained that there is a more direct route to eastbound I-10 than the one Betances took—namely, continuing north on Highway 146 from Highway 81. Instead, by traveling west on Highway 9 and north on Highway 113, only to ultimately turn east again on I-10, Betances added about 30 miles of unnecessary travel to his route. Rodriguez further testified that just the week before, authorities had successfully intercepted a drug-trafficking operation at a checkpoint along Highway 146. Thus, Rodriguez suspected that Betances' circuitous route may have been an attempt to avoid Highway 146 (and a potential drug checkpoint) altogether.

Rodriguez followed and ultimately stopped Betances. During his ensuing search of the vehicle, Rodriguez discovered 72.12 kilograms of marijuana in what

3

turned out to be a black burlap bundle with yellow and white straps sitting in the backseat. Rodriguez asked Betances about the bundle, and Betances admitted that he picked it up along Highway 81 after crossing the border.

After the government charged Betances with various marijuana-related offenses, Betances moved to suppress the marijuana and his statement, alleging the stop violated his Fourth Amendment rights. Following an evidentiary hearing, the district court denied Betances' motion, concluding that Rodriguez reasonably suspected Betances of involvement in drug trafficking. Betances entered a conditional guilty plea and later appealed the district court's denial of his motion to suppress.

## DISCUSSION

Betances argues that the district court erred in denying his motion to suppress because the vehicle stop violated his Fourth Amendment rights. When reviewing a district court's denial of a motion to suppress, we review the court's factual findings for clear error—viewing the evidence in a light most favorable to the government— and review the court's ultimate determination of the search's reasonableness de novo. *United States v. Garcia*, 751 F.3d 1139, 1142 (10th Cir. 2014).

An officer's investigatory stop of a vehicle satisfies the Fourth Amendment "if the officer's action is supported by reasonable suspicion to believe that criminal activity 'may be afoot.'" *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). In determining whether reasonable

4

suspicions exists, we ask whether—under the totality of the circumstances—there exists "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Navarette v. California*, 134 S. Ct. 1683, 1687 (2014) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). This totality-of-the-circumstances approach "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Arvizu*, 534 U.S. at 273 (quoting *Cortez*, 449 U.S. at 417-18). Finally, although reasonable suspicion requires more than a mere hunch, "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Id.* at 274.

Here, the record establishes that the Bootheel region is well-known for drug trafficking—particularly trafficking involving black, burlap bundles with brightly colored straps. Rodriguez has observed "easily over a thousand" of these bundles during his six years as a border patrol agent. R. vol. 3, 16. And he observed just such a bundle in the backseat of Betances' vehicle from a distance of approximately 10 feet, all while Betances stared straight ahead and kept both hands on the wheel. Moreover, Betances had just taken a circuitous route that added approximately 30 miles to his trip and conspicuously avoided the site of a recent drug checkpoint.

Viewed together, these factors gave rise to a reasonable suspicion that Betances was involved in drug trafficking. In this regard, the Supreme Court's

5

analysis in *Arvizu* is particularly instructive. In *Arvizu*, the Court concluded that a border patrol agent reasonably suspected the defendant of illegal activity where: (1) the defendant's route suggested he was trying to circumvent a drug checkpoint; (2) the defendant slowed his vehicle when passing a border patrol agent; (3) the defendant avoided eye contact and maintained a stiff posture as he passed the agent; (4) the backseat occupants appeared to be propping their feet on something large; (5) the backseat occupants waived at the agent in an abnormal, mechanical fashion; (6) the agent didn't "recognize the [defendant's] minivan as part of the local traffic" that agents typically encountered on patrol in the portion of rural southeastern Arizona where the stop occurred; and (7) the vehicle was registered to an address in an area notorious for alien and drug smuggling. 554 U.S. at 269-71, 275-78.

Many of the factors that gave rise to reasonable suspicion in *Arvizu* are also present here: Betances circuitously avoided the location of a recent drug checkpoint; he stared straight ahead and kept both hands on the wheel as he passed Rodriguez; and he drove a vehicle not normally encountered in the Bootheel region. If anything, the facts in this case are even more compelling than those in *Arvizu*; unlike the agent in *Arvizu*—who merely observed that the backseat occupants' "feet were propped up on some cargo on the floor," *id.* at 270—Rodriguez actually observed a large bundle with brightly colored straps, consistent with the marijuana bundles that border patrol agents in the Bootheel region encounter on a weekly basis. If the officer in *Arvizu* reasonably suspected illegal activity, even absent witnessing anything he believed to

be contraband, then the totality of the circumstances here certainly gave rise to reasonable suspicion that Betances was engaged in illegal trafficking, justifying Rodriguez's investigatory stop.[1]

Because Rodriguez's traffic stop didn't violate Betances' Fourth Amendment rights, we affirm.

Entered for the Court


Nancy L. Moritz
Circuit Judge

---

[1] Betances also argues that to establish reasonable suspicion, an agent must "*articulate the particular crime*" in which the agent believes the suspect is involved. Aplt. Br. 6. According to Betances, Rodriguez didn't do so here. Thus, Betances concludes, Rodriguez lacked reasonable suspicion to stop Betances' vehicle. In support, Betances highlights portions of Rodriguez's testimony indicating that when he first observed the object in Betances' backseat, he "couldn't tell" if it was a burlap bundle and "did not know" if it was contraband. R. vol. 3, 16, 47. But Betances quotes portions of the transcript out of context and omits key parts of Rodriguez's testimony. For example, Betances fails to mention that when Rodriguez was asked what went through his mind when he initially saw the object in the backseat, Rodriguez immediately answered, "Narcotics." R. vol. 3, 15. Betances also omits Rodriguez's testimony that he was 70-80 percent sure that the bundle contained narcotics. Thus, even if we assume, as Betances urges, that an agent must articulate suspicion of a particular crime, Rodriguez did so here.